**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**MARTINSBURG**

**JERRY BEACHLER, JR.,**
**KATHERINE MILLER,**
**TANYA RUIZ, on behalf of**
**themselves and all others**
**similarly situated,**

        Plaintiffs,

v.                                        **CIVIL ACTION NO. 3:06-CV-80**
                                           **(BAILEY)**

**RYAN'S FAMILY STEAK HOUSES,**
**INC., a South Carolina corporation,**
**and, CHARLES WAY, G. EDWIN**
**McCRANIE and FRED GRANT, JR.,**
**individually and in their corporate**
**capacity,**

        Defendants.

**MEMORANDUM ORDER DENYING**
**DEFENDANTS' MOTION TO COMPEL**
**ARBITRATION OR, ALTERNATIVELY, MOTION TO DISMISS**

Pending before this Court is defendant's Motion to Compel Arbitration, or, Alternatively, Motion to Dismiss (Doc. 3). This Court granted the parties a period of time in which to conduct discovery on the issue, followed by a briefing schedule. The parties now having fully briefed the issues, the motion is ripe for decision.

**I. Statement of Facts and Procedural History**

This case involves a class action wage and hour claim against Ryan's Family Steak Houses, Inc., now known as Ryan's Restaurant Group, Inc. ("Ryan's"). The Complaint was originally filed in the Circuit Court of Berkeley County, West Virginia, on June 8, 2006, by

1

plaintiff Jerry Beachler, Jr.  An amended complaint was filed on June 30, 2006, adding named plaintiffs Katherine Miller and Tanya Ruiz.  The defendants removed the action to this Court on July 31, 2006 (Doc. 1).   On August 4, 2006, the defendants filed the motion to compel arbitration (Doc. 3) that is the subject of this decision.

This case involves two separate sets of arbitration agreements:

**The EDSI Agreements**

Each of the named plaintiffs signed agreements with Employment Dispute Services, Inc. ("EDSI").  These agreements were between the employees and EDSI.  The employer is not a party to the agreement.  While Ryan's has a separate agreement with EDSI, that agreement is subject to cancellation by Ryan's on ten (10) days notice and does not require Ryan's to submit disputes to arbitration.  The arbitrators are selected from a pool, which is put together by EDSI.  The employee is required to pay one-half of the fees for the arbitration.  There is a close relationship between EDSI and Ryan's, with Ryan's making up a substantial portion of EDSI's income.

**The AAA Agreements**

Plaintiff Beachler also executed an agreement that states that any dispute that he has with the employer will be resolved by arbitration to be conducted by the American Arbitration Association ("AAA") under the AAA rules.  All costs of the arbitration other than the filing fee will be borne by Ryan's.  While no entity other than Mr. Beachler has signed the document, the document recites "I understand that the Company also agrees to mediate and arbitrate in the same manner any claims which the Company believes it has against me."

Plaintiff Beachler's agreement is dated July 15, 2005. In a Supplemental Declaration

2

(Doc. 29), defendant's representative, Randy Hart, stated that the "roll out" meeting of the AAA arbitration program was not until February, 2006.

## The Named Plaintiffs

Plaintiff Jerry Beachler, Jr. was employed by Ryan's from January 11, 2005, through March, 2006. He is a high school graduate with a learning disability. Mr. Beachler signed an EDSI agreement on January 6, 2005. On July 18, 2005, he signed an AAA agreement in order to get his paycheck. According to his affidavit, he was told nothing about the AAA agreement and saw no video about it.

Plaintiff Katherine Miller was employed at Ryan's from October, 2003, through December 3, 2005. Ms. Miller completed the tenth grade. Ms. Miller signed an EDSI agreement on October 26, 2003. She did not sign an AAA agreement. According to her affidavit, she did not see any video or hear any explanation concerning the AAA program, which is consistent with Mr. Hart's declaration that the "roll out" did not occur until February, 2006, or until after her employment was terminated.

Plaintiff Tanya Ruiz was employed at Ryan's for two periods: for a couple of months in early 2004, and from late 2004 through December 3, 2005. She also completed the tenth grade. Ms. Ruiz signed two EDSI agreements, on April 26, 2004, and December 3, 2004. She did not sign an AAA agreement. According to her affidavit, she did not see any video or hear any explanation concerning the AAA program, which is consistent with Mr. Hart's declaration that the "roll out" did not occur until February, 2006, or until after her employment was terminated.

## II. Applicable Law

1. Section 2 of the Federal Arbitration Act ("FAA") provides that a written arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

2. 'A party can compel arbitration if he establishes: "'(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute.'" **Adkins v. Labor Ready, Inc.,** 303 F.3d 496, 500-01 (4th Cir. 2002) (quoting **Whiteside v. Teltech Corp.,** 940 F.2d 99, 102 (4th Cir.1991)).' **American General Life & Accident Ins. Co. v. Wood**, 429 F.3d 83, 87 (4th Cir. 2005).

3. 'Generally, "[t]he FAA reflects 'a liberal federal policy favoring arbitration agreements.'" **Adkins,** 303 F.3d at 500 (quoting **Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,** 460 U.S. 1, 24 (1983)). Indeed, the FAA serves as "a response to hostility of American courts to the enforcement of arbitration agreements, a judicial disposition inherited from then-longstanding English practice." **Circuit City Stores, Inc. v. Adams,** 532 U.S. 105, 111 (2001) (citing cases). Moreover, the FAA was intended to "create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." **Moses H. Cone Mem'l Hosp.,** 460 U.S. at 24.' **Id.**

4. A court is required to "resolve 'any doubts concerning the scope of arbitrable issues ... in favor of arbitration.'" **Hill v. PeopleSoft USA, Inc.,** 412 F.3d 540, 543 (4th Cir.

4

2005) (quoting *Moses H. Cone Mem'l Hosp.,* 460 U.S. at 24-25).

5. "Although federal law governs the arbitrability of disputes, ordinary state-law principles resolve issues regarding the formation of contracts. *Hill,* 412 F.3d at 543 (citing *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944 (1995); *Moses H. Cone Mem'l Hosp.,* 460 U.S. at 24). Specifically, 'courts should remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds for the revocation of any contract.' *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20 (1991) (internal quotations and citations omitted)." *Id.*

6. "'[G]enerally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2.' *Doctor's Assocs., Inc. v. Casarotto,* 517 U.S. 681, 687 (1996) (citing cases)." *Id.*

7. State-law principles derived from West Virginia law cannot be used to invalidate the Agreement based solely on the fact that it contains an arbitration provision. "The Supreme Court has made clear that 'state law, whether of legislative or judicial origin, is applicable *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.' *Perry* **[*v. Thomas*]***,* 482 U.S. [483,] at 492 n. 9 (stating further that '[a]n agreement to arbitrate is valid, irrevocable, and enforceable, *as a matter of federal law* ... ') (citing *Moses H. Cone Mem'l Hosp.,* 460 U.S. at 24); *see* 9 U.S.C. § 2." *American General, supra* at 90.

### III. Discussion

With respect to the arbitration agreement with EDSI, a number of Federal courts have determined the agreement to be unenforceable. In ***Goins v. Ryan's Family Steakhouses, Inc.***, 181 Fed.Appx. 435 (5th Cir. 2006), the Fifth Circuit held the agreement to arbitrate to be unenforceable, due to the fact that the agreement was between the employee and EDSI and did not require Ryan's to submit to arbitration. In fact, Ryan's could cancel its agreement with EDSI on ten days notice.

In ***Walker v. Ryan's Family Steak Houses, Inc.***, 400 F.3d 370 (6th Cir. 2005), the Sixth Circuit held the EDSI arbitration agreement to be unenforceable for a number of reasons: that the agreement lacked consideration, in that Ryan's was not bound by the agreement and could cancel the agreement on ten days notice; that Ryan's mere promise to consider the employee's employment application if the arbitration agreement was signed was not sufficient consideration to support the agreement; that the employee did not knowingly and voluntarily execute the arbitration agreement; and, that due to the symbiotic relationship between EDSI and Ryan's, the fact that EDSI is a for-profit entity which would want to keep Ryan's, a customer making up 42% of its gross income, as a customer, and the fact that EDSI selected and designated the panel of arbitrators, the arbitral forum was not fair and neutral.

The Seventh Circuit, in ***Penn v. Ryan's Family Steak Houses, Inc.***, 269 F.3d 753 (7th Cir. 2001), also refused to enforce the EDSI agreement. In its decision, the Court stated:

> In the district court, Penn argued that the EDS arbitration system is inherently biased against employees. Relying on cases such as ***Hooters of America, Inc. v. Phillips***, 173 F.3d 933, 938-39 (4th Cir.1999), Penn reasoned that an arbitration agreement that forces a party to arbitrate before a biased tribunal cannot be enforceable.  Although Penn raised objections to several aspects of the EDS system, the overarching theme of his challenge was that EDS is no more than a straw-man for the employers who fund it, and thus, presumably, any award they rendered would reflect the kind of "evident partiality" that the Federal Arbitration Act (FAA), 9 U.S.C. § 10(a)(2), recognizes as a reason for unenforceability.  As Penn notes, with the exception of relatively insignificant filing fees, employers pay the cost of EDS arbitration.  Unlike some other arbitration fora such as the American Arbitration Association, EDS handles only employment arbitration, so essentially all of its funding comes from employers.  In addition, the employers who contract with EDS are repeat players, and if an employer becomes dissatisfied with EDS's services, EDS stands to lose a substantial amount of business.  On the other hand, EDS has no incentive to seek approval from the employees who appear before it, because the employees are for all practical purposes captive customers.  For all these reasons, Penn argues, EDS has a very strong incentive to tilt its arbitration panels in favor of the companies that employ it.

269 F.3d at 756.

The Seventh Circuit also noted that EDSI had complete control over the names that appear on the lists for both the employer's arbitrator and the employee's arbitrator. The Court stated that "[a]lthough both the employer and the employee have the right to strike arbitrators from the lists for cause, this feature is of little practical help to the employee as long as EDS controls the three names from which the employee must choose. Nothing prevents EDS from finding the stool pigeons among the employee population and offering the employee only the opportunity to choose the least among three evils." 269 F.3d at 757.

The **Penn** Court also found that the fact Ryan's could cancel the agreement on ten days notice "does nothing to inspire our confidence that EDS is incurring any real detriment" that would provide consideration for the agreement. The Seventh Circuit also found that a mere promise to consider an application for employment did not provide consideration for the agreement.

Finally, Judge Wood's concurring opinion in **Penn** includes the following:

Penn was being hired as a waiter in a chain restaurant, not as a corporate executive. His employment was only to be "at will." Likely a substantial share of his income would be from tips. The agreement, the rules, the relationships between the parties, and the ramifications of the arbitration arrangement have now reached this court to sort out. Above his signature this agreement states that Penn signed it "knowingly and voluntarily." We doubt it could have been "knowingly" in view of its complexities, or even "voluntarily." Had he questioned its meaning and its complexities, it is doubtful Penn would have been hired. However, the agreement provided

8

that Penn had the right to consult an attorney, but even if Penn could have afforded an attorney, the appearance of any attorney on the scene would doubtless have foreclosed any job opportunity. In Ryan's eyes, Penn would look like a troublemaker. If he wanted the waiter's job, he would be trapped in an unfair situation until a court could unravel it.

269 F.3d at 761.

As noted above, the validity of the agreement is to be determined on state law, albeit not taking into consideration any state hostility to arbitration. In this case, we have the guidance of the West Virginia Supreme Court of Appeals, which considered the validity of the EDSI agreement in *State ex rel. Saylor v. Wilkes*, 216 W.Va. 766, 613 S.E.2d 914 (2005). In *Saylor,* the Court invalidated the EDSI agreement. The Court found that the arbitration agreement was unconscionable based on several factors: (1) the bargaining power between the employer and applicant, who had a tenth grade education, was grossly unequal; (2) the terms of the agreement were non-negotiable and "clearly" weighed in favor of the employer; (3) the employer retained the unilateral right to modify rules governing arbitration without input or notice to the employee at any time[1]; and (4) the applicant was likely unaware that she was signing the arbitration agreement with a third party arbitration services company, and not with the employer itself. 216 W.Va. at 774, 613 S.E.2d at 922. According to the Court, these circumstances demonstrated a "flagrant disparity in bargaining power," a "lack of meaningful alternatives available" to the applicant, and "the

---

[1]This deficiency has since been cured by EDSI by a provision which requires that the employee may insist that the arbitration be conducted in accordance with the rules in effect at the time he signed, assuming of course, that he had some idea what those rules were.

omission of critical terms and conditions in the arbitration document." 216 W.Va. at 774-75, 922-23. In addition, the employer's mere promise to consider the applicant's application was inadequate consideration for the applicant's promise to submit to arbitration, thereby supporting an additional reason to invalidate the arbitration provision. 216 W.Va. at 775-76, 613 S.E.2d at 923-24.

Based upon the foregoing authority and this Court's own review of the facts, this Court cannot find the EDSI arbitration agreement to be enforceable for the following reasons:

1. The fact that Ryan's may cancel its agreement with EDSI upon ten days notice and is not a party to the employee's arbitration agreement deprives the agreement of the requisite mutuality. **Goins v. Ryan's Family Steakhouses, Inc.**, 181 Fed.Appx. 435 (5th Cir. 2006); **Walker v. Ryan's Family Steak Houses, Inc.**, 400 F.3d 370 (6th Cir. 2005); **Penn v. Ryan's Family Steak Houses, Inc.**, 269 F.3d 753 (7th Cir. 2001); **Geiger v. Ryan's Family Steak Houses, Inc.**, 123 F.Supp.2d 985 (S.D. Ind. 2001). See **Hill v. Peoplesoft USA, Inc.**, 412 F.3d 540 (4th Cir. 2005) ("Because an illusory promise is not binding on the promisor, an illusory promise cannot constitute consideration.");

2. A promise to consider an employment application is insufficient consideration to support an arbitration agreement. **Walker,** supra; **Penn,** supra; **Geiger,** supra;

3. Due to the symbiotic relationship between EDSI and Ryan's, an arbitration system that *de facto* permits Ryan's to select all the arbitrators is inherently unfair and unenforceable. **Walker,** supra; **Penn,** supra; **Floss v. Ryan's Family Steak Houses, Inc.**; 211 F.3d 306 (6th Cir. 2000); **Geiger,** supra. See **Murray v. United Food & Commercial**

*Workers*, 289 F.3d 297 (4th Cir. 2002) and ***Hooters of America, Inc. v. Phillips***, 173 F.3d 933 (4th Cir. 1999);

    4.    Given the limited education of the employees, this Court does not believe that the employees made a knowing and voluntary waiver of their right to access to the civil courts. ***Walker**, supra; **Geiger**, supra; **State ex rel. Saylor v. Wilkes***, 216 W.Va. 766, 613 S.E.2d 914 (2005);

    5.    Under West Virginia law, the EDSI agreement was unconscionable. ***Saylor**, supra.*

Based upon the foregoing, this Court will not compel arbitration under the EDSI arbitration agreements.

The AAA arbitration agreements present a more difficult set of facts. There appears to be the requisite mutuality and the arbitration forum would be fair, making the first three bases for invalidating the EDSI agreements inapplicable. In addition, the existence of an adhesion contract and grossly unequal bargaining positions is not sufficient to invalidate an arbitration agreement unless the agreement itself contains unfair terms. ***American General Life & Accident Ins. Co. v. Wood***, 429 F.3d 83, 89 (4th Cir. 2005).

With respect to plaintiff Beachler, the only plaintiff to have signed an AAA agreement, this Court finds insufficient evidence that he made a knowing and voluntary waiver of his right to trial in the civil courts. The facts disclose that Mr. Beachler signed the agreement on July 18, 2005, in order to get his paycheck. According to his affidavit, he was told nothing about the AAA agreement and saw no video about it. Inasmuch as Ryan's has admitted that it did not "roll out" its explanation of the AAA agreement until February,

11

2006, the Court finds his claim of receiving no information or explanation to be credible.

Ryan's argues that even though an employee may not have signed an arbitration agreement, if that employee elected to remain employed after the "roll out," that employee has impliedly assented to be bound by the agreement. It is clear, however, that 9 U.S.C. § 4 requires a "written agreement for arbitration." In the absence of a written agreement, this Court will not impose arbitration on Ryan's employees.

At this time, the Court will also deny that portion of the motion seeking dismissal of the individual defendants. If the discovery and evidence establish a systematic and systemic program to deny those wages to which West Virginia workers are entitled, then the individual defendants would be amenable to jurisdiction under the West Virginia long-arm statute. W.Va. Code § 56-3-33.

### IV. Conclusion

For the reasons stated above, this Court **DENIES** defendant's Motion to Compel Arbitration, or, Alternatively, Motion to Dismiss (Doc. 3).

It is so **ORDERED**.

The Clerk is hereby directed to transmit copies of this Order to counsel of record herein.

**DATED:** September 21, 2007.

JOHN PRESTON BAILEY
UNITED STATED DISTRICT JUDGE